Good morning. May it please the Court, my name is Brad Hudson. I'm appearing today on behalf of Experience Hendrix and Authentic Hendrix, which I'll refer to as the Hendrix Companies for purpose of this argument. I'd like, please, to reserve five minutes for rebuttal. The parties to this case have presented this Court with a fairly straightforward choice of law question, and that is, will this Court apply a statute enacted by the Washington legislature to a dispute between two residents of the State of Washington over a transaction that incurred entirely in the State of Washington, or will this Court choose to apply the civil rights law of New York? It depends upon the product. Well, the transaction didn't … It depends upon the product. I don't think there's any – I don't think there is any dispute that in this case The product was never in Washington. The rights – it is our position that the rights that were allegedly infringed, in fact, were rights created by a Washington statute, by the Washington legislature, which has the authority as a State government to create rights, to define them, to recognize them. What was the product involved in this case? What is the product that's involved in this case? The particular products were in terms of the personality – we're talking about in terms of the personality rights. The infringements that took place of those rights were uses of elements of Jimi Hendrix's personality by the Foundation, and that did occur entirely in the State of Washington. The product was born in the State of Washington. It was created in the State of Washington. The rights … I mean, in New York. Well, if we're talking about – if we're talking about Jimi Hendrix himself, I believe he was born in the State of Washington. We're talking about his death and what he left. In this case, when we're talking about the Washington Personality Rights Act, we are not talking about what was left under the laws of the State of New York at the time that Jimi died. We are talking about statutory rights created by the Washington legislature, and those rights were created, recognized, defined, the terms of transfer defined, all within the Washington statute, and protected from infringement within the State of Washington by the Washington statute. I guess the question is, Mr. Jimi Hendrix, in New York, died in New York. Did he have any property to descend to anyone, which in this case would be, did he have these descendable publicity rights when he died? And that gets to, I guess, part of the analysis of the conflict of law, which is, was there an actual conflict and what did New York hold? So maybe you want to discuss that part of your argument. In terms of the Washington Act, the Washington legislature created a bundle of rights when it enacted its personality rights statute, and obviously that statute was not in effect when Jimi Hendrix died. But they are a bundle of rights that the State of Washington created, like any other bundle of rights that a state has the power to create, and it defined the terms of those rights according to the terms of the statute. And for that reason, whatever New York law held at the time of Jimi's death has nothing to do with the operation of the Washington statute, with one small exception. Because the Washington statute has an explicit provision in it that says there is a circumstance under which we will look to the law of the State where the person was domiciled at the time of death for one particular thing. And that is when a person dies intested in another state, then the personality rights created under the Washington statute, they're not extinguished, they are going to pass to somebody, but it says we will look to who in that other state would have received the other intangible property rights. Not this particular property right, but the other intangible property rights. And the reason for that is to keep the bundle of rights together. If you contrast the Washington statute, say, with the Indiana and the California statutes, they have provisions that say if it can't pass under a will, then they designate a class of persons who will receive them. It is possible under those statutes that the personality rights created under those State statutes would pass to people, someone other than the person who would receive the rest of the intangible property rights. And what the Washington statute says is that the Court is to look to the State where the person was domiciled at the time of death for only this one thing, and that one thing is who is going to receive those rights. So when we're talking about applicability of the Washington statute, what we're talking about is the power of the State of Washington to say we are going to recognize a property right in the State of Washington. Here are the terms under which we are going to recognize that property right, just like any other property right. We're going to define it under the terms of our statute, and we're going to decide how it can be passed and under what conditions it will be passed. And we will protect it against infringement in the State of Washington. So Washington, under its choice of law analysis, under its restatements, it looks at, first, whether there's, as I understand it, whether there's an actual inheritance of the property rights, and then considers this most significant relationship test and determine whether the Washington Personality Rights Act makes a difference in that. Is that? No, Your Honor. I don't think that's the correct answer. Okay. So why don't you walk us through what a Washington State court would do for analyzing choice of law. The key provision in the restatement is Section 6. Section 6 says, here's the roadmap for how you decide a conflict of law if you're going to use the restatement. The first thing that the statute says, that the restatement says, is in paragraph 6.1, follow a statutory directive of the forum State on choice of law. And we can talk about it. Let's talk about what that means in a minute. But I want to give the flow of the analysis. What you said, Judge Ikuda, put, follow the law of the forum State where the person resided at the time of their death, put that as the first step in the analysis. That is not the first step in the analysis under the restatement. Step one is take a look at what the statute says. Now, in size, there seems to start with the looking for the general rule. So are you saying that the court would normally just go right to Section 6? I would say that Section 6, Section 6 sets out what the proper analysis is. In other words, that's the roadmap of the guts of the analysis. Okay. Only if there is no applicable statute do we go to 6.2, which is the multifactor balancing test. Now, the rest of the restatement and what comes behind it takes this multifactor balancing test and applies it everywhere the authors of the restatement could think of to say, here's where we think the results are going to be under what we would call the normal case, garden variety case, no special interest case. So you get back and you can find, for example, Section 622, here's the general section on property. You get back to you get back to Section 260, and it addresses particularly movable property. But when you read through the statement and the comments to the restatement in all of those sections, what they say is the analysis is the multifactor analysis. And we're giving you where we think under the normal case that would come out. So the actual flow of the analysis under the restatement is, one, is there a statute? If there is a statute, we stop. We don't get to the multifactor analysis. We don't get to even what these garden variety normal rules would be. And in fact, that's what the comments to the restatement tell us to do. And I'm specifically referring to the comment B, the very end, where it says, provided that it is constitutional to do so, the court will apply a local statute in the manner intended by the legislature, even when the local law of another state would be applicable under the usual choice of law principles. So even if in Washington, if this if we didn't have a Personality Rights Act, then we would look and say, what would be the usual choice of law principle in the State of Washington? But when the legislature enacts a piece of legislation like the Personality Rights Act, that automatically trumps whatever the normal rule would be. That's what the restatement tells us. So doesn't subsection comment on subsection 2C then go on to say that legislatures usually legislate only with the local situation in mind? That's true. But then that would be if we went to 6.2. In other words, if you go back and take a look, in other words, comment C does say that, but it has to be taken in the context of what comments A and B tell us about statutory directives. And I think it's important to talk about it because statutory directive sounds like a pretty formal term when you read it up in 6.1. What the comments to the restatement say is, it is very rare for a statute to say, a State to pass a statute that says, oh, and by the way, we mean to apply this law of this statute. In other words, that's what an express choice of law provision would be. It would be to say, we intend to apply it. We intend to apply it in all circumstances. Didn't the California law have some specific language that was applicable only in California that was in the draft case? In California, the analysis is completely different. And particularly in the Karens case, it was completely different, where the legislature already had a statute in place that says, unless there is authority to the contrary, or unless there is a statute to the contrary, we will apply this default rule. Now, when the legislature in California goes and enacts their Personality Rights Act, it is incumbent on the legislature, knowing that they have this default provision, to make an express statement that says, we intend to override that default provision. And in Karens 1, the Court decided quite properly there was no such indication from the legislature that it intended to override the default. Even worse, between Karens 1 and Karens 2, the legislature considered putting in the exact language that would have constituted law to the contrary and did not. And that's pretty darn conclusive evidence that the legislature did not intend its Personality Rights Act to be law to the contrary of the default statute. We're talking about intellectual property rights, aren't we? Yes, Your Honor. Okay. He died in New York. That's correct. New York says that intellectual property rights do not survive your death. New York said that this particular right of personality does not survive death. But it's a property right. You agree that it was a property right. Yes, Your Honor. That property right does not survive his death. Isn't that the end of the lawsuit? No, Your Honor. Oh. Why not? Because each state If it doesn't exist, how could Washington assume authority over it? Or Nevada? Because each state Or Florida? Each state, Your Honor. This is part of the beauty of living in the Republican form of government. It does not exist. Each state has the right to determine which property rights it will recognize. That's the way our Republican form of government works. And the State of Washington, when it enacts and recognizes a property right, has no obligation to use some other State's definition of that right. It's a right entirely created by the Washington legislature. So whatever happened in New York, in terms of passing, has no effect on this right created by this legislature that tells us expressly that that right, that this statutory right Well, what if someone died in London? If someone died in London? Yeah. In a case where the infringement of And the British law was there was no right of publicity. Okay. If someone died in London and the infringement took place in the State of Washington In other words, let's just pick somebody at random like Princess Diana. Let's get somebody else. Okay. It was the example that sprung to mind, Your Honor. I know. Let's say Prince Charles. Well, leave him out of this. But someone is publishing T-shirts with someone's likeness on them. Let's go to France. Pick anybody you want. You know, I'm weak on French celebrities, Your Honor. But let's say it's the new French president. Oh, he's a good guy. He can't come together with anybody. All right. All right. What is the concept? Like Jimi Hendrix kind of floats around the world. He's there in Washington. You can pull it down and say, well, we recognize that there's a right of publicity that concerns his name that we're to give effect to here. But, you know, I guess I have trouble with the concept of infringement, because if nobody in Washington State has any particular right to this, he died, Jimi Hendrix died intestate, so no one in Washington has any particular right to this inchoate right, which was extinguished upon his death in New York. So I'm just trying to understand who could possibly infringe any publicity right. And, again, it's a difficult concept. These are the sort of rights that are being created under these State statutes are different than other property rights that we talk about. But the right is that he's going to be able to do it. But I understand how it would work in Washington. Excuse me? I understand how it would work in Washington. Someone dies. They have personality rights that exist. They can't go either by will or by the laws of interstate succession. And the person who inherits them, they can enforce them against infringement. What I don't understand is if there were no such rights when the person died and they're extinguished upon his death, how anyone gets a claim to them. By operation of the statute in Washington. And that's the – that is the distinction. In other words, when we're talking about who gets those rights, we're talking about the reason no one has them after death is because New York law says that. New York law doesn't have to say that. Each State can define for itself when applying to when – when, as long as they're within their constitutional reach, can decide which rights to recognize and how to  So if Mr. Hendricks, he dies in New York, he has personal property in Washington, and the personal property goes according to Washington laws of interstate succession and not New York, is that what you're saying? No, I'm not saying at all. This – this statute is limited to one particular right, and that is the right of personality. But why wouldn't that personal property in Washington go according to Washington laws of interstate succession? It would depend on what – it would depend on what Washington's probate code would be, or it would depend upon what the Washington choice of law rule would be in the absence of a statute that does something different. So we'd have – again, we'd have a choice of law analysis. What are we going to – which State's law are we going to apply? And I believe that whether it's either statutory under the probate code or simply an analysis of the normal case, the normal rule would be that – that the – that it would pass under New York law. But that's – just because that's the rule. It's because that's the rule that the State of Washington follows. Did you want to take some time? Yes, I would, unless there are further questions. That's a Republican form of government, right? Well, I think so. I mean, that's – this is what – it's – we're in a messy stage of development of a new property right in the country in this. And each State has the ability to enact its own laws and define that right, and they're not going to fit together unless and until, A, they get together and somebody draws up a model act and a bunch of States adopt that so that they take care of some reciprocity issues, or the federal government says we're going to exercise our power under the Commerce Clause and we're going to enact federal legislation. But until either of those things happen, we have to take this messy situation with these rights and follow what the conflicts of law rule is. That's – that's what tells us which State's law to apply. Why don't you settle this case? Your Honor, there have – there were extensive efforts to settle the case. The major impediment is the district court's summary judgment order, because it has continuing implications for how the Hendricks companies go about their business. It says you don't have a right that these companies had thought they had, believed they had, have been exercising for a period of time. And as long as that order is in place, it makes it very difficult to settle. There was – we did go through the mediation services here, and heroic attempts were made, but it simply was not settleable. Thank you. May it please the Court, Distinguished Counsel, my name is James Nelson. I'm from Betz Patterson in Seattle. Ann Jacobson and Mel Simberg from Simberg-Ketter and I represent the Foundation. There's only one issue in this appeal. The narrow issue before this Court is whether a right of publicity existed and descended in New York in 1970. In my judgment, maintaining focus on that issue is key to understanding and resolving this appeal. Again, in simple words, did a right of publicity survive death in New York in 1970? The issue turns on a conflict between Washington and New York law. Given the nature of this very narrow issue at hand, whether a right of publicity survived death in New York in 1970, the District Court correctly and painstakingly, as we shall see, concluded that New York had the most significant relationship to this dispute. But why can't the State of Washington say, you know, we don't care what New York says. We recognize a right of publicity for all people who die anywhere in the world, and at least with respect to Washington, it's going to go to per will or per next of kin, and we'll enforce it in Washington. Now, if Washington State had enacted legislation that was that specific, could they do that and could they enforce it in Washington? Absolutely not. I was hoping somebody would ask me that question. Good. Go ahead. I would refer to the Court to page 571 of BMW v. Gore and footnote 16 therein. I'll just read a little bit. I could go on and on. But while we do not doubt that Congress had ample authority to enact such a policy for the entire nation, that is, you've got to tell people about if you fix the paint on a BMW, it is clear that no single State could do so, or even impose its policy choice on neighboring States. No State can legislate except with reference to its own jurisdiction. Well, this is just in Washington. I'm just saying enforce this right in Washington State. But it is not, because they are telling New York, Washington is purporting to tell New York what right to recognize in its domiciliaries in 1970. The only way you can answer this question is to know what New York law was in 1970, because that's where he died and that's where the only rights he has emanate from. I think that answers Judge Ferguson's first question. Washington can legislate with regard to Washington, but it can't legislate with regard to New York. It can't legislate with regard to Great Britain, and it can't legislate with regard to India. That's the way these people want to read this statute, and that is unconstitutional under both the full faith and credit clause and the due process clause. Your Honor, Authentic contends that the Act is a statutory directive to apply Washington law in determining whether post-mortem publicity rights exist in all out-of-state domiciliaries who died after 1948. Basically, Authentic argues that the Act contains a statutory directive that applies to all persons. The reason that this is a statutory directive, according to Authentic, is the terms all persons and the use of the word shall three times in the statute. That's all I got. This Act is plainly not a statutory directive as to the choice of the law to be applied in this publicity rights case. This Court in Corns, in Cairns, held that a similar California publicity rights statute did not contain such a directive. Authentic squirms to distinguish Cairns by arguing that Cairns involved a default property or a default choice of law provision that doesn't apply in Washington. But that's not the point. In Cairns, this Court upheld a California district court's application of the statutory default provision. This Court applied the default provision precisely because California's right of publicity statute did not contain a statutory directive. That's the true import of Cairns here. This Court's holding in Cairns applies with equal force in this case. In the opinion, it recites, Section 3344.1N does not state that California's postmortem right of publicity statute applies to such cases regardless of the domicile of the owner of the right. Well, neither does RCWS 6360.030. Just like the California personality rights statute, this Court construed in Cairns, the Washington Act does not say that it will apply regardless of the domicile of the decedent. There's no statutory directive. Appellants cannot escape this Court's holding in Cairns. It's virtually directly on point against their case. You asked earlier whether — how Washington goes about applying the conflicts of law — Washington's forum rules in this state. If you look at Judge Zilley's opinion at ER 242 and 243, it's, you know, a wonderful example of how a court properly applies conflict of law rules in Washington. A federal court exercising supplemental jurisdiction applies the conflict laws of the forum state. Washington is the forum state, and Washington follows the restatement. Under the Washington rules, we first look for a true conflict. The Court concluded there was a true conflict in this case. It comes out one way under New York law, one way under Washington law. They then look for a statutory directive. The Court didn't find one here. He said it very specifically. Cairns doesn't allow one here. Absent a clear statutory directive, the Court may nevertheless determine that the forum state has such a dominant interest in resolving the issue that it will ignore traditional choice of law analysis. Judge Zilley directly addressed that as well. That's Comment B to Section 6 of the restatement. Judge Zilley expressly concluded that Washington does not have that sort of a dominant interest here. He found no statutory directive, and he found no dominant interest that says he should apply the Washington law even without a statutory directive. His words bear repeating. In addition, Jimi Hendrix was domiciled in New York at the time of his death, and New York clearly has a greater interest in what property rights it chooses to recognize in its domiciliaries. Accordingly, Washington does not have a dominant interest in solving the problem presented in this case such that the Court should ignore the traditional choice of law principles and apply the Washington statute. The point is that Washington follows the race restatement, and Judge Zilley painstakingly and thoughtfully applied it in this case. But he didn't stop there. Again, in his order, ER 242 and 243, finding no statutory directive or Comment B range of application rationale why the Washington law should apply, he then turned to the most significant relationship test. Again, he focused on the narrow issue. Did these rights survive in New York in 1970? Here's what he said about the most significant relationship test. Finally, after weighing the most significant relationship factors to determine if the Act changes its original choice of law analysis, this Court concludes that New York has the most significant relationship to the issue presented here, whether an intangible personal property right existed and descended in New York in 1970. He goes on, Washington courts have repeatedly recognized the significant relationship a state has to issues regarding the descent of personal property in repeatedly following the traditional rule that the law governing a personality, even an intangible personality, is the law where the person is domiciled. So to recapitulate, Judge Zilley found an actual conflict, looked at Section 6.1 for a statutory directive, looked even deeper into Comment B and found out and determined that even though there wasn't a statutory directive, there was no dominant interest. He then painstakingly applied the most significant relationship test. He then went on to apply the domicile test as a backup check, and he concluded that New York law applies. And that's what this appeal is about. All roads lead to Rome. Every single test comes out the same. For common sense reasons, you need to have uniformity in this sort of thing, and uniformity dictates that you have to let New York decide what rights its decedent domiciliaries have at death. Do you think as a result of this case, New York's going to change its law? You know, reading the New York cases and their interplay with the Second Circuit is one of the most fascinating things I've ever done. And this has been going on for 30 years or more, and the legislature has not changed it yet. I don't know why, but they haven't done it yet. I don't think they will, personally. Well, wait till movie stars decide not to die in New York. If I had any fame at all, I would not be domiciled in New York. Washington, California, or Indiana would probably be my top choices. Just like authentic cannot get itself off of the lance of Cairns, it's equally impaled on the lance of Stefano. New York's highest court did resolve this dispute. After 30 years of silence, it said that publicity rights are statutory creatures. They arise out of Civil Rights Act Sections 50 and 51, and they do not survive death. Can you tell me what you make of the odd footnote in Stefano's footnote 2, which says that in view of the fact the plaintiff is asserting his own right of publicity, we need not consider whether the statute would also control assignment, transfer, or dissent of publicity rights? I can tell you that my opinion is the same as the Second Circuit, which said that that footnote is curious indeed. The language I quoted is a square holding of Stefano. I don't personally believe the footnote is consistent with it. I've read some of the law review articles trying to figure that all out. I think it was an unfortunate footnote, but it was a footnote. I can't reconcile it. Okay. Thanks. Back to the beginning, and I'll sit down. This case is only about whether publicity rights survived death in New York in 1970. Common sense tells us that's a question of New York law. Judge Zille applied the Washington conflict of law rules painstakingly, carefully, thoroughly, and constitutionally, and concluded that New York law applies. Cairns dictates that there's no statutory directive. Stefano settles the question of what rights existed in 1970. This Court respectfully should affirm the trial court. Thank you. All right. Rebuttal. Just a few points. The issue is whether the State of Washington has the power as a State in this Republican form of government. To create a property right, define it, say how it's going to be transferred, and then enforce infringement of it without having to say, oh, every other State's rule is going to have to trump ours. The Washington statute does not tell New York what to do. New York will get to decide how its property descends. There's not even a principle that says Washington has to accept that the domiciliary State controls when it comes to matters of property. That has to do with adoption of uniform probate codes. It has to do with common law decisions in each of the States. But they're not required to. And Washington is not required to say that when it comes to these personality rights, the law of New York dictates the scope of those rights. Well, what about, say, someone like, passed away like John Wayne? How does Washington law? If John Wayne passed away within the last 50 years, so he would be within the statute's look-back provision, which says that those rights exist. See, when you talk about personality rights, you omit very carefully the word property. If you don't have property, you've got nothing. It's a personality property right. That's correct, Your Honor. How can Washington resurrect it when the State of New York says it's gone? It's not resurrecting it, Your Honor, and it's because each State has the power to define property rights. To create its own. That's correct. That's the way our form of government works. New York doesn't get to decide that the right is gone. So if John Wayne's, if John Wayne's, he didn't die 50 years ago. Yes. Maybe five years ago. Ten years ago. But if he has two sons in California, I don't know what they're doing with his name. But how would the Washington statute work as far as John Wayne's name and likeness are concerned? If there were no use of name and likeness in the State of Washington, the statute would not apply at all, because the statute is very definite that it applies to infringements that occur in the State of Washington. Washington would Well, say someone started, say you started using it today. If I started using it today? Yeah. See, I'd be an infringer and I'd be in the State of Washington. If, then it would depend on who received those rights, whether, and again, we get into the Marilyn Monroe cases now, and if it's true that they couldn't pass by will, then they would pass to whoever received the intangible rights from John Wayne's estate. And so let's say that's both of his sons who live in New York. And if I start printing up T-shirts with John Wayne's likeness on them and sell them, Washington says you're in violation of that right and the holder of that right can come into the State of Washington and enforce that against you. But Washington, say, could enact a law that would enable you to have the rights in Washington. Okay. Thank you. If I don't get out of this cold courtroom, I'll probably freeze and I'll have no rights to leave. I can assure you, Your Honor, that from down here it's warm. Warm, hard, long.
judges: Pregerson, Ferguson, Ikuta